IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| MARK L.,<br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>    Defendant. | Case No. 4:18-cv-04008-SLD-JEH |

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 11) and the Defendant's Motion for Summary Affirmance (Doc. 15). This matter has been referred for a Report and Recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be granted, the Defendant's Motion for Summary Affirmance be denied, and the matter be remanded.

**I**

Mark L. filed his applications for disability insurance benefits (DIB) and supplemental security income (SSI) in November 2014. He alleged disability beginning on October 26, 2013.[1] His claims were denied on March 25, 2015 and were denied upon reconsideration on July 28, 2015. Mark filed a request for hearing concerning his applications on September 9, 2015. A hearing was held

---

[1] Mark points out that he amended his date of onset to coincide with his 55th birthday. During the hearing before the ALJ, Mark's counsel stated, "I've talked to [Mark] about why he might want to amend his disability beginning date to his 55th birthday. He has agreed to do that and we would like to amend to 7/22/2015 as the 55th birth date. The actual birthday was 7/23/15." AR 44. The opening paragraph of the ALJ's Decision does not mention Mark's attempt to amend his onset date, though later in the Decision the ALJ included that Mark "subsequently changed age category to advanced age[.]" AR 34.

1

before the Honorable Gregory Smith (ALJ) on January 17, 2017. At that hearing, Mark was represented by an attorney and a Vocational Expert (VE) testified. Following the hearing, Mark's claims were denied on February 14, 2017. His request for review by the Appeals Council was denied on December 1, 2017, making the ALJ's Decision the final decision of the Commissioner. Mark filed the instant civil action seeking review of the ALJ's Decision on January 8, 2018.

II

Mark was 53 years old on the alleged disability onset date that the ALJ proceeded to use in his Decision (October 26, 2013). Mark claimed his ability to work was limited by tendonitis, plantar fasciitis, gout in his ankles, and blood clots in his legs and lungs.

> At the hearing, Mark's counsel made the following opening statement:
>
> The DDS concluded that there were non-severe physical impairments, denied the claim at initial and reconsideration level. The DDS was working with a 10/26/13 alleged onset date. I've talked to [Mark] about why he might want to amend his disability beginning date to his 55th birthday. He has agreed to do that and we would like to amend to 7/22/15 as the 55th birth date. The actual birthday was 7/23/15. And our theory of the case is that as a person of advanced age, with the evidence that we now have supporting the diagnosis of gout or arthritis, the plantar fasciitis, and ankle degenerative problems resulting in limitation, motion and pain and some swelling on occasion, that it would be very difficult for him to do work that would require him to stand and walk throughout the day . . . And I think we can prove that with his impairments, that would be difficult for him to do. He's prepared to talk about how he deals with those problems and why he thinks he can't work as of his 55th birthday.

AR 44.

The ALJ then began to question Mark. Mark testified that his feet sometimes hurt from pressing the pedals while he drove. His then-current source of income was $100 per week playing guitar in church every Sunday. He received food

stamps and had Allina healthcare insurance benefits. He earned his GED and previously worked as a grinder. Mark testified further that while he worked as a grinder he did not lift very much, but he had to roll giant wheels. He stated rolling them was too much for his ankles to take. He then worked on a press machine. He was laid off from his previous jobs.

Mark testified that he had a problem with his left ankle. "[I]f I spend more than 20 minutes or so walking or whatever, then they swell up and they hurt." AR 50. He clarified that his left ankle bothered him more than his right ankle did. He said he also "sometimes" had lower back pain. *Id*. He said his ankles were "uncomfortable all the time." *Id*. His pain level was a 4 out of 10 in both ankles at the hearing. On a bad day, his pain level was a 10 out of 10. "Once every now and again [about once a month]" Mark "might" take an Aleve, though he tried not do that. AR 51. Mark explained that he also "sometimes" wrapped his ankles or put braces on them to help with swelling or pain. He wore his braces "maybe twice a week." AR 52. He elevated his feet every day. He did so "[m]ost of the time when [he was] sitting[.]" AR 53. Mark elaborated upon his ability to walk for 20 minutes. After 20 minutes, "[t]hey would swell up. And actually, they hurt during the 20 minute walk, you know, but not real bad." AR 53. He confirmed his ankles and back affected his ability to lift and carry such that he tried to carry nothing if he could help it. Mark estimated he could lift "maybe five pounds." *Id*. He could stand in one spot for 15 or 20 minutes …before his ankles began to bother him. Mark testified that he previously took physical therapy when his ankles first started to bother him. He stated the therapy did not help him. Mark believed his ankles were getting worse. He was otherwise able to take care of his own personal needs.

When questioned by his attorney, Mark testified that his left ankle pain was aggravated by standing and walking while his pain was relieved by rest. Though

a doctor prescribed him something called an AFO brace, Mark never obtained one because he did not know where to get such a brace. He estimated that he was able to walk and stand 2 hours total in a day of standing and walking for 15- to 20-minute intervals. He was laid off from his last job in 2013 because he was "in the doctor's office a lot of times." AR 57. "After my ankles got to hurting real bad, I'd have to take a couple of days to where I could walk again . . . It got where I couldn't walk at all." AR 57, 58. Finally, Mark testified that he lived in subsidized housing and qualified for that special housing due to low income.

Lastly, the VE was questioned.

### III

In his Decision, the ALJ determined that Mark's only severe impairment was degenerative joint disease of the left ankle. The ALJ made the following residual functional capacity (RFC) finding:

> [C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can frequently climb ramps and stairs, ladders, ropes, or scaffolds, balance, stoop, kneel, crouch, or crawl. In addition, the claimant can occasionally work at unprotected heights and around moving mechanical parts.

AR 31. In making that finding, the ALJ first provided a summary of Mark's hearing testimony. The ALJ then summarized what the medical evidence contained in the file indicated prior to Mark's alleged onset date of October 26, 2013: he was seen for bilateral ankle pain and swelling of the left ankle in December 2011 and a left ankle x-ray showed chondral abnormality in August 2013. The ALJ also provided that after Mark's alleged onset date he was noted to have normal range of motion and muscle strength of the musculoskeletal system, stability in all extremities with no pain on inspection, and no edema present on October 29, 2013.

The ALJ next discussed Mark's March 2015 consultative examination. He reported disability due to ankle problems and indicated that he had ankle tendinitis and plantar fasciitis. He had physical therapy but no injections or surgery. During the physical examination, Mark was able to get on and off the exam table with no difficulty, was able to walk greater than 50 feet without support and a non-antalgic gait, perform heel/toe walk, and range of motion of the hips and knees was not limited. His ankles had full range of motion but with pain on movements. The ALJ pointed out that an April 2015 record provided Mark had normal gait and indicated he was able to exercise.

Treatment notes dated from July 2015 to September 2015 indicated Mark had a left ankle x-ray which showed degenerative change and potential subchondral cyst in the talar dome. In July 2015, Mark exhibited left ankle swelling "but only mildly reduced range of motion." AR 33. The ALJ continued, "However, by September 2015, the claimant had normal range of motion of the left ankle and no abnormalities of the right ankle . . . In October 2015, the claimant was prescribed a left ankle brace." *Id*. The State Agency consultants' opinions that Mark did not have any severe impairments were given "little weight." The ALJ reasoned that the evidence received at the hearing level supported Mark's degenerative joint disease of the left ankle which caused "more than minimal functional limitations on the claimant's ability to perform work-related activities on a sustained basis." *Id*.

The ALJ stated, "The undersigned has considered the claimant's subjective complaints with regard to pain, precipitating and aggravating factors, medications and other treatment, and any functional restrictions and claimant's daily activities[.]" AR 33. Further:

> The foregoing evidence does indicate that the claimant has some abnormalities that are likely to impose some functional limitations.

5

> However, the undersigned concludes that these findings are not indicative of any intractable condition that would preclude the claimant from performing a reduced range of medium work activity for 12 consecutive months.

*Id.* Finally, the ALJ determined the RFC finding was "supported by some of the claimant's own objective allegations, the relatively benign objective findings, the conservative degree of treatment the claimant has received, the claimant's response to treatment, and the record as a whole . . . ." *Id.*

### IV

Mark argues the ALJ's finding that he could do medium work is not supported by substantial evidence. In particular, Mark argues: the ALJ failed to identify anything to show that Mark's allegations of his inability to stand for prolonged periods was at all inconsistent with the record; the ALJ failed to identify anything in the record to support his finding that Mark was capable of lifting between 25 to 50 pounds; the ALJ made a number of conclusory statements without analysis or assessment in reaching his conclusions about the consistency of Mark's complaints of pain; and because the ALJ's finding that Mark was capable of performing medium work is unsupported by substantial evidence, the issue of transferability of skills under the grids is still open.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the

ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566; 20 C.F.R. § 416.966.[2] The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1)  currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)  suffers from an impairment that is severe or whether a combination of her impairments is severe;

---

[2] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI). Thus, the Court may at times only cite to the DIB regulations.

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Mark takes issue with the ALJ's Decision at Steps Four and Five.

## A

Dispositive of the question whether remand is warranted in this case is Mark's argument that the ALJ never questioned him about the nature of his treatment or why he did not seek treatment following 2015. SSR 16-3p states, in relevant part:

> [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms

> inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

SSR 16-3p at *9. Succinctly stated, "Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).

Here, the ALJ determined Mark's statements concerning his impairments and their impact on his ability to work were not fully supported, in part, given the degree of medical treatment he required and his medical history. The ALJ later summarized that the RFC finding was supported, among other things, by the record as a whole which did not "exhibit the types of ongoing medical treatment . . . one would expect for a totally disabled individual." AR 33. Nowhere in his Decision did the ALJ elaborate in that regard. He did little more than reference the medical evidence in the record that predated Mark's alleged onset date. As for the medical evidence that followed Mark's alleged onset date, the ALJ explicitly discussed evidence dated October 2013, April 2015, and dated between July 2015 and September 2015. The final medical record to which the ALJ referred in his Decision was a left ankle brace prescription for Mark dated October 13, 2015. At no time during the January 17, 2017 hearing did the ALJ question Mark about the extent of his treatment or why there were no medical records dated after October 2015.

Contrary to the regulation by which the ALJ was bound and the relevant case law, the ALJ clearly drew a negative inference about Mark's condition from

9

his lack of medical care without first exploring any explanations he may have had as to the lack of medical care. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009), *quoting Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (reiterating that an ALJ must not draw any inferences about a claimant's condition from infrequent treatment or failure to follow a treatment plan unless the ALJ has explored the claimant's explanations as to the lack of medical care). The Commissioner's argument in response falls flat. Mark does *not*, as the Commissioner argues, "imply" that the ALJ found he exhibited "noncompliance" with treatment. Mark implies no such thing; he argues outright that the ALJ erred by not asking him "any questions about why he did not seek treatment following 2015 nor did [the ALJ] explore any of the other reasons for [Mark's] failure to *seek* treatment." Plf's MSJ (Doc. 12 at pg. 17) (emphasis added).

　　　As Mark points out, there was evidence in the record that indicated he was unable to pay for his medical care. In a September 9, 2015 medical record, the Intake Comments section provided, "Pt is unable to go to ORA [Orthopedics] of [sic] past bills." AR 387. On a Referral Form dated July 14, 2015, there is a note that says, "UNABLE to schedule patient must speak to Business office!!" AR 414. Mark argues that despite the fact he was referred to ORA for his left ankle pain, the July 14th and September 9th notations in the record confirm his statement about the problem he has with past due bills and medical treatment. Also, a December 6, 2011 medical record (Mark complained of pain in both feet since February 2011) included that Mark did not have any health insurance. AR 276. The ALJ cited that very record in his Decision. At a minimum, such a notation should have put the ALJ on notice that further inquiry had to be made into Mark's financial ability to pursue treatment. *See Shauger*, 675 F.3d at 696 ("good reasons" for not seeking medical treatment or consistently pursuing treatment include an inability to afford treatment). It was a notation in a record that the ALJ concluded

10

did not otherwise "demonstrate a condition of the degree of severity alleged" and did not "exhibit the types of ongoing medical treatment . . . one would expect for a totally disabled individual." AR 33. While Mark testified at the hearing in January 2017 that he had health insurance *at that time*, the ALJ did not consider how long Mark had gone without it before that time and whether such a lack of health insurance explained the less developed medical record. Because the ALJ did not inquire in any meaningful way, it also cannot be ruled out that Mark's treatment was *consistent* with his claims or that he was merely remiss in dealing with his impairment (as Mark argues). If the ALJ was going to rely so heavily upon the sparse treatment record, he had a duty to inquire into what reasons, if any, Mark had for not pursuing more treatment; a duty he did not fulfill. Such an error warrants remand.

## B

The Court refrains from considering the other errors Mark alleges the ALJ committed in finding that he could do medium work. The ALJ's conclusions that Mark's medical history and the record as a whole did not support the alleged severity of his impairments compelled his ultimate conclusion that Mark was not disabled. Therefore, along with recommending that this matter be remanded for the ALJ to explore Mark's reasons for the lack of medical care, it is also recommended that the remaining issues must also be re-evaluated given the ALJ's potentially skewed perception of the entire medical record. Specifically, the Court recommends that this case be remanded for the ALJ to also identify record evidence to show how Mark's allegations of his inability to stand for prolonged periods was inconsistent with the record (if that is true), identify what in the record supports his finding that Mark was capable of lifting between 25 to 50 pounds, refrain from making conclusory statements without analysis or assessment in

reaching conclusions, and address the fact that Mark attempted to amend his alleged onset date to his 55th birthday.

V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 11) be granted; 2) the Defendant's Motion for Summary Affirmance (Doc. 15) be denied; and 3) this matter be remanded for the ALJ to explore Mark's reasons for the lack of medical care, identify record evidence to show how Mark's allegations of his inability to stand for prolonged periods was inconsistent with the record (if that is true), identify what in the record supports his finding that Mark was capable of lifting between 25 to 50 pounds, refrain from making conclusory statements without analysis or assessment in reaching conclusions, and address the fact that Mark attempted to amend his alleged onset date to his 55th birthday.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on January 14, 2019.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE